UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.  Case No. 3:18-cr-115-J-34JBT

JAMAAL ABU TALIB HAMEEN
   a/k/a Charles Flowers

## O R D E R

**THIS CAUSE** came before the Court on Defendant's Motion to Dismiss for Prosecutorial Misconduct in Reference to Brady Violation(s) (Doc. 180; Motion to Dismiss), filed on November 28, 2018, in which Defendant maintains that the government's failure to disclose surveillance video of his arrest constitutes a violation of Brady v. Maryland, 373 U.S. 83 (1963).[1] See generally Motion to Dismiss. Defendant has alternatively argued that the government's failure to preserve the video constitutes a violation of California v. Trombetta, 467 U.S. 479 (1984) and Arizona v. Youngblood, 488 U.S. 51 (1988). See November 29, 2018 Suppression Hearing Transcript (Doc. 197; Nov. 29 Tr.) at 223-24. The government filed a response in opposition to the Motion to Dismiss on December 3, 2018. See Response in Opposition to Motion to Dismiss for Prosecutorial Misconduct in Reference to Brady Violations (Doc. 194; Response). Despite not seeking or obtaining leave of Court to do so, Defendant filed a reply to the government's Response, and the Court has considered it. See Defendant's Response to: Response in Opposition to

---

[1] Also remaining before the Court is one issue raised in Defendant's request for subpoenas for witnesses and documents relating to his Motion to Dismiss. See Motion for Subpoena of Witness(es) for Motion to Dismiss for Prosecutorial Misconduct (Doc. 200; Motion for Subpoena), filed on December 4, 2018.

Motion to Dismiss for Prosecutorial Misconduct in Reference to Brady Violations (Doc. 216; Reply) filed on December 10, 2018; Memorandum of Law in Support of Reply (Doc. 221), filed on December 11, 2018. The parties presented testimony and other evidence relevant to the Motion to Dismiss during a suppression hearing on November 29, 2018, and during an evidentiary hearing on December 11, 2018. In addition, the Court conducted an <u>in</u> <u>camera</u> review of the State Attorney's Office entire hard copy file and electronic record regarding the state's now abandoned prosecution of Defendant for the conduct underlying the instant prosecution. Thus, this matter is ripe for review.

After hearing evidence regarding the Motion to Dismiss on the morning of December 11, 2018, the Court announced that it would deny the instant Motion to Dismiss. At that time, potential jurors had been assembled and were waiting to be brought to the courtroom for jury selection for Defendant's trial, which was also scheduled to begin on December 11, 2018.[2] In light of this, the Court provided the parties with a brief summary of its analysis and explained that, although the Court planned to enter a thorough written order on the Motion to Dismiss, it would do so later and proceed with beginning the trial. Thus, the Court announced its resolution of the Motion to Dismiss and stated its intention to enter a comprehensive written order at a later date. The Court fulfills that intention here, but also incorporates the reasoning given at the December 11th hearing.

---

[2] Ultimately, trial did not proceed on December 11, 2018, because after the evidentiary hearing on the morning of December 11th and before jury selection began, Defendant announced that he no longer wished to proceed pro se. Because Defendant had recently attempted to name his court-appointed standby counsel as a defendant in a civil lawsuit, which Defendant initiated in state court in September 2018, the Court appointed a new attorney to represent Defendant at trial. As such, the Court granted a continuance so that Defendant's new attorney would have sufficient time to familiarize himself with the case and to prepare for trial.

**I.    Background**

On July 18, 2018, a federal grand jury returned an Indictment (Doc. 1; Indictment) charging Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  The charge stems from Defendant's February 7, 2018 arrest for trespassing at the Eagle Inn in Jacksonville, Florida, in violation of Florida Statute section 810.09.[3]  According to law enforcement officers, in attempting to make that arrest, the officers discovered a firearm tucked under Defendant's arm.   On October 31, 2018, Defendant moved to suppress the evidence seized during his arrest, arguing inter alia that the officers lacked probable cause for the arrest.  See Defendant's Legal Notice and Demand for the Suppression, Voiding and or Exclusion of All Physical Written and Recorded Evidence the Prosecution Plans to Use Against 'Affiant' at Trial (Doc. 123; Motion to Suppress).  On November 20 and 29, 2018, the Court held an evidentiary hearing on the Motion to Suppress.  See November 20, 2018 Suppression Hearing Transcript (Doc. 196; Nov. 20 Tr.); Nov. 29 Tr.  On December 4, 2018, the Court entered an order denying the motion.  See Order Denying Motion to Suppress (Doc. 206).  In denying the Motion to Suppress, the Court determined that the government had "met its burden of proving by a preponderance of the evidence that the Officers had probable cause to arrest Defendant."  Id. at 18.

On the first day of the suppression hearing, the government presented the testimony of the following witnesses: Jacksonville Sheriff's Office (JSO) Officer Rodney Driggers, JSO Detective Morel Sepulveda, and JSO Officer Anastasia Scott, all of whom

---

[3] Defendant was originally charged in state court with trespass and possession of a firearm, as well as a number of other offenses. See State v. Hameen, Case No. 16-2018-CF-001289-AXXX-MA (Fla. 4th Cir. Ct.).   The state charges were nolle prossed on July 23, 2018, after the instant case was filed.  Id.

were present for and involved with Defendant's arrest; JSO Sergeant Darren Scott, who came to the scene at Defendant's request after the arrest; and Mr. Snehal Patel, who is an owner of the Eagle Inn and was also present at the time of the arrest.[4]  See Nov. 20 Tr.  Relevant to the instant Motion to Dismiss, Mr. Patel testified that JSO officers retrieved Eagle Inn surveillance video capturing Defendant's arrest.  See generally Nov. 20 Tr. at 260-63, 281-86.  Defendant had previously requested surveillance video from the government,[5] see Demand for Discovery (Doc. 37) at 3 (seeking "[a]ny/all unedited video from the motel from 0100 a.m. to 0330 a.m. on Feb. 7, 2018"), and the Court ordered the government to respond to Defendant's request, see August 21, 2018 Motion Hearing Transcript (Doc. 80) at 104.  However, before Mr. Patel testified, the government had consistently maintained that there was no surveillance video to turn over.  Indeed, Mr. Patel's testimony appeared to be the first time that the attorneys for the government had heard of the possible existence of Eagle Inn surveillance video of the arrest.[6]

On the second day of the suppression hearing, the parties also presented testimony and other evidence relevant to the surveillance video issue.  Specifically, Defendant and

---

[4] Defendant presented the testimony of Mr. Juakeem Pickens and Mr. Ronnie Reed, but neither witness provided testimony relevant to the existence of any surveillance video.  See Nov. 20 Tr.

[5] Defendant also submitted a public records request to JSO on September 27, 2018 seeking "all video evidence," but he specified "telephones (JSO) & vehicle video" and did not mention surveillance video.  See Motion to Dismiss, Exhibit B (Doc. 180-2; Public Records Request).

[6] Defendant has also asserted that Mr. Andy Patel, who apparently owns the Economy Inn, a hotel across the street from the Eagle Inn, was in possession of surveillance video of Defendant's arrest.  See e.g., Nov. 20 Tr. at 18-19 (Defendant arguing that Andy Patel actually owns the Eagle Inn, but lives at the Economy Inn where he has a security room that allows him to hear and see "what goes on" at both hotels). As Defendant notes in the Motion to Dismiss, he attempted to subpoena Andy Patel prior to the first day of the suppression hearing, but the Court denied the request.  See Motion to Dismiss at 2.  In doing so, based upon the information then available, the Court found that Defendant had not shown that the attendance of Andy Patel at the suppression hearing was necessary for an adequate defense.  See November 16, 2018 Sealed Ex Parte Order (Doc. 158) at 3; Ex Parte Sealed Portions of November 14, 2018 Motion Hearing (Doc. 220) at 52-53.  Nevertheless, Defendant was able to question Snehal Patel about Andy Patel's surveillance system at the suppression hearing.  See Nov. 20 Tr. at 283-86.  During that questioning, Snehal Patel testified that Andy Patel does not have the capability to view the happenings on the Eagle Inn property over any sort of video feed when he is not there, and that Andy Patel does not have a copy of a video showing Defendant's arrest.  Id. at 283-85.

the government questioned Officer Driggers, Detective Sepulveda, Officer Scott, and Mr. Patel about the Eagle Inn surveillance video. See Nov. 29 Tr. Without objection, Defendant introduced an affidavit relating to the initiation of his state court case. See Affidavit (Doc. 186-1; Def. Ex. 13). The government presented the testimony of Jessica Lewallen, a paralegal in the felony division of the State Attorney's Office (SAO) for the Fourth Judicial Circuit in Jacksonville, Florida. Over Defendant's objection, the government introduced a screen shot of the SAO's recording system, STAC, showing a notation made by Ms. Lewallen regarding a call she made to the Eagle Inn on February 28, 2018, in reference to possible surveillance video of Defendant's arrest. See STAC Screenshot (Doc. 186-2; Gov't Ex. 4). In addition, at a status hearing held on December 4, 2018, the government produced a copy of a February 23, 2018 work request submitted to Ms. Lewallen by Jessica Narducci, the assistant state attorney assigned to Defendant's case, requesting that Ms. Lewallen obtain inter alia surveillance video. See Work Request (Doc. 207-1; Gov. Ex. 1).

Also at the December 4, 2018 status conference, the Court addressed Defendant's request for subpoenas for witnesses and documents relating to his Motion to Dismiss. See Motion for Subpoena. Among other individuals, Defendant sought to subpoena Ms. Narducci and his SAO case file to clarify "the whereabouts and responsible parties involved with the loss, destruction, abandonment of the video evidence." Id. at 4. The Court dispensed with Defendant's request to subpoena Ms. Narducci, by ordering, at Defendant's request, the government to submit the SAO's entire hard copy and electronic record regarding Defendant for an in camera review for any document that related in any

way to the existence of a surveillance video of his arrest.[7]  See Clerk's Minutes of the December 4, 2018 Status Conference (Doc. 207).  The government provided the SAO records to the Court on December 7, 2018, and the Court conducted a thorough review of those records.

## II. Relevant Evidence

### A. Mr. Patel

As noted above, on the first day of the suppression hearing, Mr. Patel testified that after Defendant was arrested, the officers "came in back to look at the [surveillance] video, and they made a copy of the video, the arrest."  Nov. 20 Tr. at 260.  Mr. Patel then corrected himself, testifying: "I'm sorry.  They came the next day to make the video for the arrest."  Id. at 261.  Mr. Patel could not remember who retrieved the video, but he testified that "it was JSO."  Id. at 262.  Similarly, Mr. Patel was not sure whether he would recognize the individual who retrieved the video, but he thought the individual was a JSO officer who regularly worked the area.  Id. at 262-63, 282.  Mr. Patel testified that he did not have to sign anything when the officers copied the video, "they just copied it on a USB drive."  Id. at 262, 281.  Mr. Patel recalled that someone told him that the person needed the video "[f]or the arrest - - of your arrest," and that he was taking the video "[t]o JSO." Id. at 281.  Notably, when asked whether he thought the video would contain evidence that would contradict his testimony or that of the JSO officers regarding the events leading to Defendant's arrest, Mr. Patel responded, "No."  Id. at 282.  Mr. Patel also testified that the Eagle Inn surveillance video is not transmitted electronically to anyone and does not

---

[7] The Court also stated that it would revisit Defendant's request to subpoena Ms. Narducci, if appropriate, after completing its review of the SAO files, and Defendant did not object to this course of action. After a thorough review of the SAO files, the Court finds that Ms. Narducci's testimony is not necessary to the Court's ruling on the Motion to Dismiss.  Accordingly, Defendant's Motion for Subpoena will be denied.

capture audio.  Id. at 283, 286.  Further, Mr. Patel testified that there was not another copy of the surveillance video of Defendant's arrest, id. at 283, 285, and that the Eagle Inn surveillance video is automatically erased after ten days, id. at 286.

When questioned about the existence of the video again during the November 29th hearing, Mr. Patel testified that JSO officers came to the Eagle Inn the morning after Defendant's arrest to look at the video.  See Nov. 29 Tr. at 106.  He testified that the officers did not have a flash drive with them; "[t]hey said they going to come back to get it again."  Id.  In addition, Mr. Patel reiterated that he did not remember which officer came to the Eagle Inn to retrieve the surveillance video.  Id. at 87, 100, 107.  However, Mr. Patel also testified that he may have helped Officer Annastasia Scott get video from the Eagle Inn on more than one occasion and that "it could have been" this case for which he helped her get video.  Id. at 105, 108.  Later, when asked if he gave "some JSO personnel a copy of that video," Mr. Patel testified, "I think I did."  Id. at 106.

### B. The JSO Officers

Defendant questioned Officer Driggers, Detective Sepulveda, and Officer Scott about the existence of the surveillance video during the November 29th hearing.  Each officer testified that he or she had not gone to the Eagle Inn to retrieve surveillance video of Defendant's arrest.  See Id. at 39, 63, 69, 116, 122, 123, 129.  They all also testified that, to their knowledge, no other JSO officer retrieved surveillance video of Defendant's arrest.  Id. at 51, 70, 123, 136.  Notably, Officer Scott testified that she had retrieved surveillance video from the Eagle Inn once before at the request of the SAO, but it was for a different case, not for Defendant's arrest.  Id. at 38, 46, 50.  Detective Sepulveda testified that while he sometimes goes to the Eagle Inn to view surveillance video, he has

never copied their video or used any for a case. Id. at 116. Officer Driggers testified that, in general, when officers retrieve surveillance video after an arrest, there is "a record through the supplemental report and it being placed into evidence." Id. at 72. Similarly, Detective Sepulveda testified that, in general, when JSO officers retrieve surveillance video, they submit the video into the JSO property room and give the video to the SAO. Id. at 138.

On December 11, 2018, Defendant questioned Sergeant Darren Scott regarding the existence of surveillance video of his arrest.[8] Sergeant Scott testified that the decision to retrieve surveillance video is made on a case by case basis. Similar to Officer Driggers and Detective Sepulveda, Sergeant Scott testified that, if an officer retrieves surveillance video evidence, it is placed in the JSO Property Room and is also recorded in either the original arrest and booking report or, if the video is retrieved after the arrest, in a supplemental arrest and booking report.[9] Notably, Sergeant Scott testified that there is no record of the surveillance video of Defendant's arrest in the JSO Property Room. He also testified that no supplemental arrest and booking report was completed in Defendant's case.[10] Finally, Sergeant Scott testified that he did not view or retrieve the Eagle Inn

---

[8] As of this time, no transcript has been prepared from the December 11, 2018 hearing.

[9] Notably, although Defendant's arrest and booking report lists various items of property seized by JSO the night of Defendant's arrest, no surveillance video is listed. See Arrest and Booking Report (Doc. 186-1; Def.'s Ex. 14). The Arrest and Booking Report was introduced into evidence by Defendant at the November 29th suppression hearing. Copies of the JSO property records were included in the SAO files reviewed in camera by the Court. The Court's review confirmed that the property records contained no mention of a surveillance video.

[10] Defendant has repeatedly speculated about the existence of a supplemental arrest and booking report in his case. However, there is no evidence that any such supplemental report exists. In addition to Sergeant Scott's testimony that no such report exists, Officer Scott testified that she did "not recall doing a supplement report" in this case, see Nov. 29 Tr. at 32, and Detective Sepulveda testified that there was no supplemental report in this case, id. at 123.

surveillance video of Defendant's arrest, nor did he know of any other officer having done so.

### C. Ms. Lewallen and the SAO Records

During his direct examination of Detective Sepulveda, Defendant inquired about an Affidavit relating to the initiation of his state court case. The Affidavit, dated February 7, 2018, is signed by Detective Sepulveda and was provided to Ms. Narducci. See Def. Ex. 13 at 2. See also Nov. 29 Tr. at 119-20. In the Affidavit, Detective Sepulveda states the nature of Defendant's offense, identifies the circumstances leading to Defendant's arrest, and summarizes the evidence of Defendant's guilt. See Def. Ex. 13. In handwriting that appears to be Ms. Narducci's, the phrase "surv. video possible" is written on the bottom left-hand corner of the second page of the Affidavit. Id. at 2. When asked about this notation, Detective Sepulveda testified that he did not recall his entire conversation with Ms. Narducci or whether he was asked to retrieve any surveillance video. See Nov. 29 Tr. at 122. Notably, in conducting its in camera review of the SAO files, the Court found one other reference to a "surveillance video." This reference appeared in Ms. Narducci's notes dated February 7, 2018—the same date as the Affidavit. At the bottom of her notes, Ms. Narducci wrote simply "surveillance video."

The Work Request produced by the government shows that on February 23, 2018, Ms. Narducci requested that Ms. Lewallen obtain various items regarding Defendant's case, including arrest and booking reports, the booking photo, CAD reports, certified judgments and sentences, fire rescue reports, and surveillance video. See Gov. Ex. 1. Ms. Lewallen testified that on February 28, 2018, in response to Ms. Narducci's Work Request, she called the Eagle Inn to inquire about obtaining surveillance video of

Defendant's arrest.  See Nov. 29 Tr. at 180-81.  Ms. Lewallen testified that she spoke with someone who identified himself as a manager of the Eagle Inn.  Id. at 181.  The manager told Ms. Lewallen that there was a video "at the time of the incident," id. at 191, but "[t]hat the video was unavailable.  That it had been erased."  Id. at 182.  The manager also told Mr. Lewallen that "he had told the officer to come back the next day after the incident to pick up the video, and he didn't show up."  Id.  Ms. Lewallen testified that she never obtained a copy of the surveillance video and that, to her knowledge and based on her review of relevant SAO records, no one else at the SAO did either.  Id.  Ms. Lewallen did not remember having any interactions with the officers who arrested Defendant.  Id. at 195.  Notably, Ms. Lewallen recorded a contemporaneous note reflecting her phone call to the Eagle Inn on the Work Request form and in the STAC recording system.[11]  See Gov't Ex. 1 & 4.

### III. Standards

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."  Trombetta, 467 U.S. at 485.  This standard ensures that criminal defendants have the opportunity to present a complete defense.  Id.  "To safeguard that right, the [Supreme] Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'"  Id. (quoting United States v. Valenzuela–Bernal, 458 U.S. 858, 867 (1982)).  For example, under Brady and its progeny, the government has a constitutional obligation to disclose exculpatory evidence in its possession to a criminal defendant.  See Brady,

---

[11] The STAC Screenshot shows that on February 28, 2018, Ms. Lewallen made the following entry in STAC: "Called Eagle Inn to see if surveillance available.  Was told the video erased after 10 days.  The manager told the officer to come back the day after the incident to get the video but he never did."  Gov't Ex. 4 at 2.

- 10 -

373 U.S. at 87.  To establish a Brady violation, a defendant must show that: (1) the prosecution possessed evidence favorable to the defendant; (2) the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, a reasonable probability exists that the outcome of the proceedings would have been different.  See United States v. Bailey, 123 F.3d 1381, 1397 (11th Cir. 1997).  Thus, Brady addresses the government's obligations when exculpatory evidence is in the government's possession.

In Trombetta and Youngblood, the Supreme Court addressed "the extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession" and "the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants."  See Trombetta, U.S. 479 at 486; Youngblood, 488 U.S. at 55.  Thus, Trombetta and Youngblood, and not Brady, govern circumstances in which the government no longer possesses the disputed evidence because it was lost, destroyed, or otherwise not preserved before trial.  See United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1993) ("The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes.  Brady and its progeny address exculpatory evidence still in the government's possession.  Youngblood and Trombetta govern cases in which the government no longer possesses the disputed evidence.").  The Eleventh Circuit has described the required showing under Trombetta and Youngblood as follows:

> "In order to show that the loss of evidence by the government constitutes a denial of due process, the defendant must show

that the evidence was likely to significantly contribute to his defense. California v. Trombetta, 467 U.S. 479, 488 (1984)." United States v. Brown, 9 F.3d 907, 910 (11th Cir.1993). "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (quoting Trombetta at 489). "[F]ailure to preserve this 'potentially useful evidence' does not violate the due process clause 'unless a criminal defendant can show bad faith on the part of the police'" Illinois v. Fisher, 540 U.S. 544, 547-48 (2004), quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

United States v. Revolorio-Ramo, 468 F.3d 771, 774 (11th Cir. 2006).[12] See also United States v. Cruz, 508 F. App'x 890, 901 (11th Cir. 2013) ("To establish a due process violation based upon destruction of evidence, the defendant must also show bad faith on the part of the police. Bad faith is present if the officer destroyed the evidence 'in a calculated effort to circumvent the disclosure requirements established by Brady v. Maryland.'" (quoting Trombetta, 467 U.S. at 488)).

---

[12] The Court notes that some circuits read Trombetta and Youngblood to have announced two different standards depending on the type of evidence the government failed to preserve. See, e.g., United States v. Collins, 799 F.3d 554, 569-70 (6th Cir. 2015); Magraw v. Roden, 743 F.3d 1, 7-8 (1st Cir. 2014). Under this interpretation, Trombetta applies where the government fails to preserve "apparently exculpatory evidence," that leaves the defendant with no ability to obtain comparable evidence by any other reasonable means, regardless of whether the government acts in bad faith. See Collins 799 F.3d at 569; Magraw, 743 F.3d at 7-8. Youngblood, on the other hand, applies where the government fails to preserve "potentially useful evidence" and mandates a showing of bad faith. See Collins 799 F.3d at 569; Magraw, 743 F.3d at 8. The Eleventh Circuit has never made such a distinction and appears to read both cases to require a showing of bad faith. See, e.g., Revolorio-Ramo, 468 F.3d at 774; Cruz, 508 F. App'x at 901 (quoting Trombetta's bad faith standard without distinguishing between whether the evidence was "apparently exculpatory" or "potentially useful"). See also McCarthy v. Pollard, 656 F.3d 478, 484-85 (7th Cir. 2011) ("Trombetta and Youngblood do not create two separate rules, with the former governing 'apparently' exculpatory evidence and the latter governing 'potentially' exculpatory evidence. We instead read both cases to stand for the same proposition: the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means."); Femia, 9 F.3d at 993-94 ("Trombetta and Youngblood together established a tripartite test to determine whether a defendant's due process rights have been infringed by law enforcement's failure to preserve evidence."). As discussed below, Defendant's Motion to Dismiss is due to be denied under either interpretation of Trombetta and Youngblood. This is so because Defendant has failed to present any evidence suggesting that the surveillance video is either "apparently exculpatory" or "potentially useful," and even assuming arguendo that the video was potentially useful, Defendant cannot establish bad faith.

## IV. Analysis

In his Motion to Dismiss, Defendant argues that the government's failure to disclose the Eagle Inn surveillance video of his arrest constitutes a violation of the principles set forth in <u>Brady</u> or alternatively <u>Trombetta</u> and <u>Youngblood</u>. <u>See</u> <u>generally</u> Motion to Dismiss; Nov. 29 Tr. at 223-24. In support, Defendant maintains that he "repeatedly alleged that a video existed and that said video would have recorded the actual event(s) that occurred on February 7, 2018." Motion to Dismiss at 5. Defendant further asserts "that said video would have provided exculpatory evidence on his behalf." <u>Id.</u> In this regard, Defendant contends that the Eagle Inn surveillance video would show where he was standing before and during his arrest and whether he "was attempting to comply with the owner/manager request to leave the property." <u>Id.</u> Thus, Defendant maintains that the video would be exculpatory, not in the sense that it would show he did not commit the offense charged, but in the sense that it would show that the officers did not have probable cause to arrest him for trespass. As a result, he contends the video would show that the search incident to his arrest, during which the officers discovered the firearm, would have been illegal. In response, the government maintains that although there may have been surveillance video of Defendant's arrest available at some point, "the video was not copied by JSO" and no such video has ever been "in the possession of the United States or any government agency." Response at 6. The government also asserts that "[t]he evidence tends to indicate that Mr. Patel is mistaken, perhaps remembering a different incident where JSO officers retrieved video . . . ." <u>Id.</u> For the reasons set forth below, the Court

determines that Defendant has failed to carry his burn of establishing that the government violated its obligations under Brady or Youngblood and Trombetta.[13]

At the outset, the Court finds that the government has not committed a Brady violation, as there is no evidence before the Court that the Eagle Inn surveillance video of Defendant's arrest is in the government's possession such that Brady would even apply. See Brady, 373 U.S. at 87; United States v. McClure, No. 90-5001, 1990 WL 180122, at *3 (4th Cir. Nov. 21, 1990) (affirming district court ruling that evidence was not Brady material in part because "the government did not possess the tape" and noting that merely "reviewing the evidence had not amounted to taking possession" of it). See also Fed. R. Crim. P. 16 (requiring disclosure of items "within the government's possession, custody, or control . . . ."). Although Mr. Patel testified to his belief that a JSO officer picked up a copy of the video relating to Defendant's arrest, the weight of the evidence leads the Court to conclude that Mr. Patel is simply mistaken—likely confusing this interaction with law enforcement at his motel with one of the many others he has had. Indeed, each of the JSO officers involved in Defendant's arrest testified that he or she did not retrieve surveillance video of Defendant's arrest or know of anyone who did. Likewise, Sergeant Scott testified that there was no record of surveillance video relating to Defendant's arrest in JSO property storage. The JSO officers also testified that there was no supplemental report done in Defendant's case, further confirming that no officer retrieved video evidence from the Eagle Inn after Defendant's arrest. In addition, although the assistant state

---

[13] The Court notes that a defendant bears the burden of establishing a due process violation based on the government's alleged failure to preserve evidence. See Revolorio-Ramo, 468 F.3d at 774 (stating that "to show that the loss of evidence by the government constitutes a denial of due process, the defendant must show that the evidence was likely to significantly contribute to his defense") (internal quotation marks and citations omitted).

attorney prosecuting Defendant's case in state court knew of the possibility of surveillance video, the evidence shows that the SAO never obtained any such video. Indeed, the Court finds Ms. Lewallen's testimony on this issue to be particularly persuasive because it is corroborated by her contemporaneous notes reflecting that when she called the Eagle Inn to obtain the surveillance video, she was told that it was erased after 10 days and that an officer had failed to return to copy it. Thus, based on the testimony of all of the JSO officers and Ms. Lewallen, as well as the Court's review of the SAO files, the Court finds that no one from JSO ever retrieved the video of Defendant's arrest.[14] As such, the government has not committed a Brady violation.

In addition, the Court finds that Defendant has failed to establish a violation of Trombetta or Youngblood based on the government's failure to retrieve and preserve the Eagle Inn surveillance video of Defendant's arrest. First, the Court finds that Defendant has not established that the video "was likely to significantly contribute to his defense," Trombetta, 467 U.S. at 488, or that the video was "potentially useful," Youngblood, 488 U.S. at 58. The testimony from the suppression hearing established that the officers had probable cause to arrest Defendant for trespassing at the Eagle Inn, and, as such, that they lawfully seized the firearm they discovered on his person in conducting a search incident to the arrest. See generally Order Denying Motion to Suppress at 4-8. Accordingly, for the surveillance video of the arrest to possess any exculpatory value, it would have to show that Defendant's arrest did not occur as described by the witnesses at the suppression hearing. In other words, the video would have to show that three JSO

---

[14] Although Mr. Patel's testimony regarding the viewing of the video is not entirely clear, the Court assumes that Mr. Patel testified that JSO officers observed the video the night of the arrest or the next day. See Nov. 20 Tr. at 260-61; Nov. 29 Tr. at 106.

officers and Mr. Patel all committed perjury when they testified that Defendant was on the Eagle Inn property and had refused to depart before the officers arrested him. The Court has no reason to engage in such speculation, as the Court has already found these witnesses to be credible. See id. at 7-8. In doing so, the Court specifically noted that "the testimony of the Officers was consistent with one another and with that of Mr. Patel, who confirmed that he ordered Defendant to leave the property, told the Officers that Defendant needed to leave, the Officers ordered Defendant to leave, Defendant argued with them, and then Mr. Patel heard one of the Officers saying, 'gun, gun, gun.'" Id. at 7 (citing Nov. 20 Tr. at 259-60). As the Court previously stated, "the uncontroverted evidence adduced at the suppression hearing established that Defendant was standing on Eagle Inn property when Mr. Patel ordered him to leave, when the Officers first arrived, and at the time of his arrest. Indeed, the Officers and Mr. Patel testified that Defendant was standing near the front office when they arrived, and not on the sidewalk. Even Defendant's own witness, Mr. Reed, placed Defendant in the driveway of the Eagle Inn, and not on the sidewalk." Id. at 12. Moreover, Mr. Patel testified at the suppression hearing that the surveillance video would not contradict his testimony. As such, the only evidence before the Court is that a video of Defendant's arrest would be inculpatory rather than exculpatory. See United States v. Parker, 72 F.3d 1444, 1451–52 (10th Cir. 1995) ("The district court found that it 'is far from apparent' that the video taped evidence would have exculpated Defendants in light of the 'strong evidence before the court indicating probable cause to search the entire vehicle.' We cannot say this finding was clearly erroneous.").

The Court also finds that Defendant was able "to obtain comparable evidence," Trombetta, 467 U.S. at 489, through the cross examination of the government's witnesses and the introduction of his own testimony or that of other witnesses. See Parker, 72 F.3d at 1452 ("Along with Trooper Sorenson, Trooper Mangleson and Defendants participated in the recorded events. Hence, Defendants could have called Trooper Mangleson to adduce what the missing video tape evidence showed. If Defendants had a different version of the events than that related by Trooper Bushnell, Defendants could have taken the stand and testified at the suppression hearing. Accordingly, Defendants had a readily available source to replace the missing video tape—Trooper Bushnell's testimony, Trooper Mangleson's testimony and their own testimony of the events. As a result, Defendants have not shown that the missing video taped evidence was constitutionally material under Trombetta.").

Finally, the Court finds that there is no evidence of bad faith by the government or any of its agents which resulted in the failure to retrieve and preserve the surveillance video. Defendant has not shown that JSO or the SAO failed to retrieve the video because of "official animus" or a "conscious effort to suppress exculpatory evidence." Trombetta, 467 U.S. at 488. As explained above, although the officers may have known that the surveillance system at the Eagle Inn existed, there is no evidence to suggest that they had any reason to believe that a video of the arrest would contain any evidentiary value favorable to Defendant. At worst, the failure to retrieve the video could be described as negligent, and mere negligence in failing to preserve evidence is inadequate to show bad faith. See Youngblood, 488 U.S. at 58.

Having determined that Defendant has failed to demonstrate that the surveillance video held any exculpatory value or that the failure to preserve the video was in bad faith, the Court concludes that Defendant has failed to establish a violation of his due process rights.

Accordingly it is

**ORDERED:**

1. Defendant's Motion to Dismiss for Prosecutorial Misconduct in Reference to Brady Violation(s) (Doc. 180) is **DENIED**.

2. Defendant's Motion for Subpoena of Witness(es) for Motion to Dismiss for Prosecutorial Misconduct (Doc. 200) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida on December 13, 2018.

*Marcia Morales Howard*
MARCIA MORALES HOWARD
United States District Judge

Lc23

Copies to:

Defendant
Counsel of Record